IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

LUIS MIGUEL SIERRA-AYALA,

    Defendant.

CRIM. NO. 17-063 (PAD)

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

Luis Miguel Sierra-Ayala was indicted for possession of heroin and cocaine with intent to distribute in violation of 18 U.S.C. § 841(a)(1), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) and possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) (Docket No. 8). Claiming that the arresting officer violated the Fourth Amendment, he has moved to suppress contraband seized at the time of the arrest and post-arrest statements (Docket No. 38). The government opposed (Docket No. 43).

The court referred the matter to Magistrate Judge Bruce McGiverin (Docket No. 44), who after a hearing, issued a well written Report and Recommendation ("R&R"), recommending that the motion be denied (Docket No. 83, p. 14).[1] Sierra-Ayala objected to the R&R and requested a *de novo* hearing (Docket No. 87), which the court granted (Docket No. 88). At the government's request, the court limited the hearing to the issue of standing (Docket No. 94). Only Sierra-Ayala and the arresting officer testified during the hearing. The parties filed post-hearing briefs (Docket

---

[1] The transcript of the hearing before the Magistrate Judge was entered at Docket No. 74. It will be referred to as "THMJ."

Nos. 101 and 103). Having carefully reviewed the record in light of applicable law, the court adopts the R&R's recommendation as it relates to the issue of standing, and denies Sierra-Ayala's motion on such basis.

## I. FACTUAL BACKGROUND

From Sierra-Ayala's testimony and description of events, he was on his way to repair his car at his mother's house in Loíza, Puerto Rico, when he stopped to buy a soda and cigarettes from a cousin, who operated a small business – a mini-mart – near the house of Sierra-Ayala's mother (Transcript of *De Novo* Hearing, "TDNH," Docket No. 99, pp. 13-14, 21). Because the cousin did not have enough change, Sierra-Ayala walked to a close-by area to ask another cousin, who was with group of people, for change. Id. at 15. That cousin asked Sierra-Ayala to hold an Adidas bag for a moment, so he could give him change, which the cousin had in his pocket (TDNH, Docket No. 99, pp. 15-17; THMJ, Docket No. 99, p. 16).[2] Sierra-Ayala held the bag for five seconds, not moving from the spot where the cousin handed him the bag, while the cousin pulled change out of his pocket (TDNH, Docket No. 99, pp. 19, 23, 27-28, 31; THMJ, Docket No. 74, pp. 145-146).[3]

Around that same time frame, officers of the Puerto Rico Police Department ("PRPD") arrived at the scene (TDNH, Docket No. 99, pp. 8-9; THMJ, Docket No. 74, p. 146). Everyone in the group, including Sierra-Ayala's cousin, started running except Sierra-Ayala. Id. The cousin left without giving Sierra-Ayala the change he had asked for (Docket No. 99, p. 18). As various officers chased the persons who had fled the scene, Sierra-Ayala was approached by Sergeant Jesús López of the PRPD's Drugs and Narcotics Division (TDNH, Docket No. 99, pp. 18, 37, 38, 39,

---

[2] Defendant testified it was his understanding that he was responsible for the bag, was to return it to the cousin, and could not give it to anyone else. TDNH, at pp. 17, 19-20. The cousin did not testify at either the hearing before the Magistrate Judge or the *de novo* hearing.

[3] A photograph of the bag was introduced as Defense Exhibit N (TDNH, p. 43).

40). Even though what happened next is contested,[4] the bottom line is that Sergeant López saw drugs inside the bag and placed Sierra-Ayala under arrest. Id. at 40, 44.[5] Sierra-Ayala said he had not seen the bag before; did not know what was inside the bag until Sergeant López told him; did not own the drugs; and had not seen them before that day. Id. at 27-28, 30-31. Moreover, he testified that his cousin had never asked him to watch anything for the cousin in the past. Id. at 31. Their relationship was not close. Id. at 19.

## II. DISCUSSION

Sierra-Ayala claims Sergeant López seized and searched the bag in violation of the Fourth Amendment (Docket No. 38). The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …". U.S. Const. amend. IV. Fourth Amendment rights are personal. See, United States v. Collins, 811 F.3d 63, 65 (1st Cir. 2016) *cert. denied* 2016 WL 1615540 (U.S. May 31, 2016)(so recognizing). The ability to assert a Fourth Amendment challenge to the search of a particular venue depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the object at stake. See, United States v. Lipscomb, 539 F.3d 32, 35-36 (1st Cir. 2008)(stating proposition).

The Supreme Court has set out a two-part test for analyzing the expectation question: first, whether the movant has exhibited an actual, subjective, expectation of privacy in the object of the

---

[4] According to Sergeant López, after he identified himself as a police officer Sierra-Ayala held open and showed López what was inside the bag (TDNH, pp. 40, 42, 44). According to Sierra-Ayala, Sergeant López told Sierra-Ayala to give him the bag, Sierra-Ayala did so, López took the bag and opened it. Id. at 18, 34. The Magistrate Judge credited Sergeant López' version, finding his testimony credible in all material respects (Docket No. 83, p. 7). For purposes of this Opinion and Order, the court assumes that the interaction between Sierra-Ayala and Sergeant López occurred the way Sierra-Ayala described it.

[5] The bag contained heroin and crack cocaine (TDNH, Docket No. 99, p. 30). During the *de novo* hearing Sergeant López testified without contradiction that the bag was open. Id. at 40. In the initial hearing before the Magistrate-Judge, Sierra-Ayala said that the bag's zipper was closed (THMJ, Docket No. 74, p. 145). For purposes of this Opinion and Order, the court assumes the bag was closed.

challenged search; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable. See, California v. Ciraolo, 476 U.S. 207, 211 (1986)(articulating formulation). While the Supreme Court has noted that the threshold analysis is more properly placed within the purview of substantive Fourth Amendment law, "courts continue to refer to it as an issue of standing." Lipscomb, 539 F.3d 32, 35-36.

In United States v. Aguirre, 839 F.2d 854 (1st Cir. 1988), the First Circuit identified the sort of factors pertinent to this inquiry, guiding courts to look into whether the individual thought of the place or the article as a private one and treated it as such; and if so, whether or not the individual's expectation of confidentiality was justifiable under the circumstances. Id. at 856-857. Whatever facts may shed light upon either step of this two-tier evaluation may be weighed in the balance, including ownership, possession, and/or control of the property; ability to regulate access; historical use; surrounding circumstances; existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. Id. The burden of proof "is on the defendant." United States v. Lochan, 674 F.2d 960, 965 (1st Cir. 1982).

Sierra-Ayala alleges that he has standing because he accepted possession of the bag from his cousin, which created a bailment between them, and as a bailee he had a legally cognizable expectation of privacy in the seized bag that allows him to challenge the constitutionality of the bag's search as a violation of the Fourth Amendment (Docket No. 101, p. 7).[6] By one account, at common law bailment consists of a contractual relationship resulting from the delivery of personal chattels by one person, called the bailor, to a second person, called the bailee for a specific purpose.

---

[6] The term "bailment" derives from the Norman-French word *bailler*, to deliver. See, Michael H. Rubin, "Bailment and Deposit in Louisiana", 35 La. L. Rev. 825 & N. 2 (1974)(so observing).

See, Michael H. Rubin, *supra* at 825 (discussing topic). When this purpose is accomplished, the chattels must be returned or dealt with according to the bailor's direction. Id. at 825, 830. Other definitions bypass the contractual element, recognizing obligations derived from possession of the good. See, Black's Law Dictionary (10th Ed.), p. 169 ("Although a bailment is ordinarily created by the agreement of the parties, resulting in a consensual delivery and acceptance of the property, such a relationship may also result from the actions and conduct of the parties in dealing with the property in question" such that, "[a] bailment relationship can be implied by law whenever the personal property of one person is acquired by another and held under circumstances in which principles of justice require the recipient to keep the property safely and return it to the owner." (quoting 8A Am. Jur. 2d *Bailment*, § 1 (1997)).[7]

In Puerto Rico, giving something to another person for safekeeping until the first person returns to recover the thing is known as depositum or deposit. See, Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 12 (1st Cir. 2005)(examining subject); United States v. González Medina, 797 F.2d 1109, 1114 (1st Cir. 1986)(same). It arises out of a contract whereby one person (the depositor) hands a piece of personal property to another person (the depositary) for the sole purpose of having the depositary keep, conserve, and return the property. Id. at 12. It has some relationship with the common law concept of bailment, albeit the two concepts are not identical. Id. (citing Michael H. Rubin, *supra*)(examining differences between civil law deposit and common

---

[7] See also, Hartford Fire Ins. Co. v. Empresa Ecuatoriana de Aviación, 945 F.Supp. 51, 56 (S.D.N.Y. 1996) *aff'd* 122 F.3d 1056 (2d Cir. 1997)(noting that "[in] the absence of a mutual contract of bailment, an implied bailment arises when a party comes into lawful possession of the personal property of another"); Wilson v. Citizens Central Bank of Nelsonville, 11 N.E.2d 118, 119 (Ohio App. 1936)("Bailment does not necessarily and always, though generally, depend upon a contractual relation. It is the element of lawful possession, however created, and duty to account for the things as the property of another, that creates the bailment, regardless of whether such possession is based on contract in the ordinary sense"); 19 Samuel Williston, *A Treatise on the Law of Contracts,* 4 (4th ed. 2016)(discussing what the author refers to as "involuntary bailments," where possession of property passes from one person to another by mistake, accident, or through the force of circumstances under which the law imposes upon the recipient the duty and obligation of a bailee).

law bailment)); II-2 José Puig Brutau, *Fundamentos de Derecho Civil*, Bosch, Barcelona, 1982, pp. 524-525(same).[8]  Unlike other contracts that involve possession of something with the aim of benefitting from or using the object,[9] in the depositum contract the person who receives the deposit receives the possession of the thing with a different aim: to care for it.  See, Astoria Jewelry v. N. Barquet, Inc., 291 F.Supp.2d 16, 25 (D.P.R. 2003), *aff'd* 410 F.3d 2 (1st Cir. 2005)(analyzing depositum contract)(citing José Ramón Vélez Torres, IV-II *Course of Civil Law*, *Contract Law*, Interamerican University of Puerto Rico, San Juan, p. 475, and José María Manresa y Navarro, XI *Commentaries to the Spanish Civil Code*, Instituto Editorial Reus, Madrid, 1950, p. 657)); Travelers Indemnity Company v. S. Klein of Puerto Rico, Inc., 676 F.Supp.32, 33 (D.P.R. 1987)(identifying custody as the essence of the deposit contract, one involving "a service or *facere*," consisting of "engaging in the necessary acts to protect and conserve the object of the contract").

As in a bailment, depositum imposes a duty of care upon the depositary.  See, Astoria Jewelry, 291 F.Supp.2d at 25-27 (duty of care in depositum); United States v. Houseal, 2014 WL 626765, *18 & n. 17 (W. D. Ky. Feb. 18, 2014)(same as to bailment).  Possession must be restored to the depositor when the depositor reclaims it, at the time agreed upon, or when the contractual purpose has been accomplished.  See, José Puig Brutau, *supra* at pp. 539-540 (discussing issue). The depositary is presumed liable for loss to the item deposited while under his exclusive possession and custody.  See, Astoria Jewelry, 291 F. Supp. 2d at 26-27 (addressing presumption).[10]

---

[8] Broadly stated, bailment is a generic term referring to different relationships involving the exchange of possession of movables, whereas deposit is confined to storage and care.  See, Michael H. Rubin, *supra* at 843-844 (distinguishing terms); José Puig Brutau, *supra* at pp. 524-525 (similar).

[9] The elements of possession and custody are also found in contracts of lease, commodatum, and pledge, among other contracts. See, Travelers Indemnity Company, 676 F.Supp. at 33 (examining subject); José Puig Brutau, *supra* at p. 521 (same).

[10] On the relationship between the asserted exclusivity and potential liability, see, Goudy & Stevens v. Cable Marine, Inc., 924 F.2d

As regulated by the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 4621-4715, the depositum contract derives from "relevant provisions of the Spanish Civil Code". N. Barquet, Inc., 410 F.3d at 12. It is not necessary that the contract be driven by a business motive. Id.[11] It is presumed gratuitous absent some agreement to the contrary and may be formed even if the depositary's motive in accepting the depositor's property is simple courtesy. Id. (citing 22:1 Manuel Albaladejo, Private Law Review: Comments to the Civil Code and Local Compilations 198-99 (1980)(describing as paradigmatic the case where a passerby, without asking for any compensation, agrees to care for another person's oxen in a public market for a few moments)). A party "receiving delivery of a thing is not required to have known the contents of it in order for a depositum contract to have been formed." Astoria Jewelry, 291 F.Supp.2d at 25.

In determining whether the parties have formed a depositum contract, courts focus on whether the delivery of the thing has been accomplished and the depositary has received the effective possession and control of the thing to the point of excluding possession by the depositor. See, N. Barquet, Inc., 410 F.3d at 13 (articulating and applying formulation); Cesaroni v. United States, 624 F.Supp.613, 620 (S.D.Ga. 1985)(pointing out that in a bailment "there must be an actual or constructive possession in the bailee, exclusive and independent of the bailor and all other persons"); Hekmat, 247 F.Supp.3d at 435 (noting that for a bailment to arise, "there must be a full transfer of property so as to exclude the possession of the owner and all other persons and give to

---

16, 18-19 (1st Cir. 1991)(addressing role of exclusivity in explaining liability for damages to a bailed object in the context of a bailment related to repair work on a vessel); Hekmat v. U.S. Transportation Security Administration, 247 F.Supp.3d 427, 435-436 (S.D. N.Y. 2017)(rejecting as inappropriate presumption of liability where purported bailee did not have sole and exclusive possession and control over luggage when jewelry was allegedly stolen).

[11] A depositum contract is deemed commercial, and therefore governed by the Commercial Code where: (1) the depositor is a merchant; (2) the items deposited are commercial goods; and (3) the deposit constitutes a commercial transaction or has been made by reason of a commercial transaction. See, N. Barquet, Inc., 410 F.3d at 13 (examining issue). There is no need to further distinguish between civil and commercial depositum contracts, as the difference is of no consequence here.

bailee sole custody and control thereof"). Consent may be express or implied. It can be inferred from the depositor's delivery of an item to the depositary, the depositary's knowing acceptance of that item, and the depositary's effective and exclusive possession and control over the item. See, N. Barquet, Inc., 410 F.3d at 5, 13-14 (so recognizing).

Measured by these parameters, the court is not persuaded that Sierra-Ayala entered into a depositor-depositary or even a broader bailor-bailee relationship with his cousin. Depositum may exist for a few moments. See, Manuel Albaladejo, *supra* at 198-199 (acknowledging scenario). Yet for a depositum to have been perfected or bailment to have been configured, the cousin must have surrendered full possession, custody and control of the bag, which was not apparent from Sierra-Ayala's description of the events, particularly as the cousin, who did not testify, remained by Sierra-Ayala's side, close to the bag, which contained heroin and crack cocaine, while he pulled change out of his pocket to give to Sierra-Ayala. Sierra-Ayala may have had physical possession of the bag, but from the evidence the court cannot conclude that the cousin relinquished custody and control over the bag and the drugs that it contained. See, In re Jeff Benfield Nursery, Inc., 565 B.R. 603, 619-611 (Bankr. W.D.N.C. 2017)(no bailment because purported bailee did not have exclusive possession, custody and control of goods but rather shared control over them)(citing Mid-South Investments, LLC v. Statesville Flying Service, Inc., 2016 WL 3958721, *8 (W.D. N.C. July 22, 2016)(bailment did not exist, for the purported bailee never had exclusive possession, custody, and control of aircraft in question)); Lieber v. Smith, 1980 WL. 935, *651 (Pa.Ct.Com.Pl. May 8, 1980)(no bailment where plaintiffs made no delivery to defendant of exclusive possession and control of their property).[12]

---

[12] Ownership of property carries with it a "bundle of sticks," a set of rights and prerogatives that can be exercised by the owner or a third party with the owner's consent. See, United States v. Craft, 535 U.S. 274, 278 (2002)(describing "property")(citing B.

Notwithstanding the absence of depositum or bailment and irrespective of how the relationship between Sierra-Ayala and his cousin is characterized, Sierra-Ayala received the bag from the apparent owner. In this way, he was authorized to possess it. But the person in legal possession of a good seized during an allegedly illegal search has not necessarily been subject to a Fourth Amendment deprivation. See, United States v. Salvucci, 448 U.S. 83, 91 (1980)(so observing). The capacity to claim the protection of the Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from government intrusion. See, Macusi v. DeForte, 392 U.S. 364, 368 (1986)(articulating formulation).

The government argues that Sierra-Ayala lacks standing because in asserting that the bag did not belong to him, he forfeited any right to privacy in the bag (TDNH, p. 51). In United States v. Zapata, 18 F.3d 971 (1st Cir. 1994), the First Circuit sustained the trial court's decision to deny a motion to suppress to a defendant who had disclaimed to the arresting officer ownership of duffel bags found in the trunk of the car he was driving. Id. at 979. According to the Court, "disclaiming ownership is tantamount to declaring indifference, and thus, negates the existence of any privacy concern in a container's contents." Id. at 979. In United States v. De Los Santos Ferrer, 999 F.2d 7 (1st Cir. 1993), the Court held that defendant's repeated statement to agents in the scene that she could not give them authority to open luggage because it was not hers, forfeited any claim of privacy in its contents. Id. at 9. In Collins, 811 F.3d at 63, the Court sustained the district court's

---

Cardozo, Paradoxes of Legal Science 129 (1928)(reprint 2000) and Dickman v. Commissioner of Internal Revenue, 465 U.S. 330, 336 (1984); II José Ramón Vélez Torres, *Curso de Derecho Civil, Los Bienes, Los Derechos Reales*, Madrid, p. 66 (discussing conception of property reflected in Puerto Rico's Civil Code). The owner may transfer all or some of these rights and prerogatives in accordance with the law. As to possession, Article 362 of the Puerto Rico Civil Code provides that "possession of property … may be considered in one of two aspects: either in that of the owner or in that of the holder of the thing." P.R. Laws Ann. tit. 31 § 1423. Thus, the physical possession of a thing with the owner's authorization does not necessarily include other attributes of ownership, such as custody, use, and control.

decision to deny a motion to suppress filed by a defendant who, in response to a police officer's question about whom a bag belonged to, disclaimed ownership of the bag. Id. at 64-66. In the Court's view, because the defendant did not "challenge the District Court's finding that he did not claim the bag was his, he cannot show he had an expectation of privacy in the bag." Id. at 65.

Along the same line, in United States v. Mc Bean, 861 F.2d 1570 (11th Cir. 1988), the defendant denied to the detaining officer ownership of two closed pieces of luggage in a car he was driving as well as knowledge of the contents of the luggage. The Court held that the defendant lacked a legitimate expectation of privacy in the luggage and its contents, finding the disclaimer analogous to abandoning the property and given that there is no legitimate expectation of privacy in abandoned luggage, the defendant could not challenge the legality of the search. Id. at 1571, 1572, 1573-1574. Similarly, in United States v. Monie, 907 F.2d 793 (8th Cir. 1990), the defendant had been hired to drive an automobile rented by another person to carry two suitcases from one point to another. He knew that the suitcases and their content belonged to someone else. When the officers asked about the suitcases, the defendant stated that they were not his, that the contents belonged to someone else, and that he had no access to the contents. The court stated that the defendant did not exhibit a subjective expectation of privacy and with his words had disavowed that expectation. Id. at 794-795.

From these cases, Sierra-Ayala would seem to have forfeited the opportunity to challenge the bag's search. But he did not disclaim anything when he was arrested at the scene. At least there was no testimony that he did so. And during the *de novo* hearing, he said that the cousin gave the bag to him, to hold it for a moment while the cousin looked for change in his pocket. In these conditions, he cannot be said to have relinquished all links to the bag to the point of legally abandoning it. See, United States v. Reeves, 798 F.Supp.1459, 1465-1466 (E.D. Wash.

1992)(defendant who, in response to an officer's question, said that a briefcase stored in his car belonged to his cousin, had standing to challenge the briefcase's search).

Turning to the quality of Sierra-Ayala's link to the bag and its correlation to the privacy inquiry here, in United States v. Rodríguez-Ramos, 704 F.2d 17, 721 (1st Cir. 1983), *cert. denied*, 463 U.S. 1209 (1983), the First Circuit recognized that there are circumstances where bailment may support a legitimate expectation of privacy. Id. at 725. Those circumstances include the relationship between travelling companions, the conditions of bailment, and precautions taken to maintain privacy. Id.[13] Thus, the existence of a bailment is merely "one of a number of circumstances to be considered when determining whether a defendant has a reasonable expectation of privacy." Houseal, 2014 WL 626765 at *18. But a bailment per se "says nothing about anyone's reasonable expectation of privacy." Id. & n.17.

Several cases shed light on where courts have drawn the line on when an individual has a legitimate expectation of privacy under analogous settings and can therefore challenge a search, and when he does not. In Rawlings v. Kentucky, 448 U.S. 98 (1980), the petitioner had stashed drugs in the purse of a woman sitting next to him as the police entered the room. Id. at 101-102. The Supreme Court found that he had no reasonable expectation of privacy in the purse that would permit him to challenge the reasonableness of a search of that purse. The fact that he claimed ownership of the drugs discovered in the purse was one factor to be considered but was not sufficient to create a Fourth Amendment interest. The Court also considered: (1) that the petitioner

---

[13] In Rodríguez-Ramos, 704 F.2d at 17, the prosecution sought to introduce in evidence a deed to the defendant's house, which he allegedly brought to a meeting with undercover drug agents to exchange for cocaine. The deed was discovered through the warrantless search of a travel bag, which was carried by the defendant's female companion at the time of his arrest. The district court concluded that the bag belonged to the companion and ruled that defendant had no standing to seek suppression of the deed. The First Circuit affirmed, noting, among other things, that the burden was on the defendant to establish circumstances substantiating an expectation of privacy in the bag, and that he had failed to carry that burden. Id. at 21.

had known the woman for only a few days, had never had access to the purse prior to the sudden bailment, and had no right to exclude other persons from access to the purse; (2) the precipitous nature of the transaction did not support any reasonable inference that normal precautions had been taken to maintain privacy; and (3) the petitioner admitted that he had no subjective expectation that the purse would remain free from governmental intrusion. Id. at 105.[14]

In the present case, Ayala-Sierra was in legal possession of the bag five seconds. The sudden and precipitous nature of the transaction does not support any reasonable inference that he took precautions to maintain privacy. The record reflects none. Sierra-Ayala's relationship with the cousin was not close. There was no historical use or prior occasion on which the cousin had ever asked Sierra-Ayala to watch the bag in question or any other bag for that matter. And the cousin was with him while Sierra-Ayala held the bag, undermining any semblance of control he may have had over the bag. See, Lochan, 674 F.2d at 965 ("Possession of the vehicle registration indicates control, but this is diluted by the owner's presence").

In United States v. Benitez-Arreguin, 973 F.2d 823 (10th Cir. 1992), the defendant was an itinerant worker who had been given a duffel-type bag to transport the bag from Los Angeles to Salt Lake City, where a woman would get the bag at a designated hotel and take defendant to a farm to work. Law enforcement officers detained defendant in the Salt Lake City train station and opened the bag, finding heroin. The defendant did not look inside the bag and did not know what was inside the bag but took care of it as if it were his. The Court held that a person transporting luggage as a bailee or at least with the permission of the owner, has a reasonable expectation of

---

[14] At the suppression hearing, the petitioner had answered "no" to the questions: "Did you feel that Vannessa [*sic*] Cox's purse would be free from the intrusion of the officers as you sat there? When you put the pills in her purse, did you feel that they would be free from governmental intrusion?" Id. at 104, n.3.

privacy that society would recognize. Id. at 825-828. Contrary to the situation of Sierra-Ayala, the defendant in Benitez-Arlequin had the bag in his possession much more than five seconds, to transport the bag to another city. Sierra-Ayala stayed where he was when, by his account, the cousin gave him the bag.

In United States v. Perea, 986 F.2d 633 (2d Cir. 1993), defendant moved to suppress a duffel bag with drugs seized from the trunk of a taxi he was riding as a passenger. He had been paid to keep the duffel bag in his apartment and subsequently transport it in a cab in which he and the driver were the only occupants. The Court found that the defendant had a subjective expectation of privacy confirmed by his repeated glancing about for surveillance while the cab was in transit, and a person transporting luggage as a bailee or at least with the permission of the owner, has a reasonable expectation of privacy that society would recognize. Id. at 636, 640-641. Differently than Sierra-Ayala, the defendant in Perea had the bag in his possession for more than five seconds, to transport it to another location. And the bag was inside the trunk of a vehicle. In the present case, the bag was in plain view.

In United States v. Carlisle, 614 F.3d 750 (7th Cir. 2010), the defendant was arrested at the home of another individual during a drug sweep. He was caught fleeing from the back of the house carrying a closed backpack, while two other officers entered the front door of the house. The Court pointed out that although defendant had disclaimed ownership of the bag, he was legitimately in possession of it, had the right to exclude all others from the bag except the home owner, who had asked him to carry the bag to the garage, and indicated that he intended to maintain privacy in the bag by holding onto it as he left the house and by keeping it closed. Still, he did not know what was in the bag or who was using the bag immediately prior to his taking it, and there was no evidence that defendant had any expectation that the bag would remain free from governmental

intrusion. Id. at 752-754, 759-760.

As previously mentioned, Sierra-Ayala was in legitimate possession of the bag and testified that when the cousin handed it to him he understood he was responsible for it, was not to turn the bag over to anyone else while the retrieved change for him and would return the bag to the cousin (TDNH, p. 7). This may signal a subjective expectation of privacy but is insufficient to support a legitimate expectation of privacy under the Fourth Amendment.[15] In the brief period that he was in possession of the bag he undertook no affirmative precautions to maintain privacy. Cf. Hershenow, 680 F. 2d at 855 (defendant's subjective expectation of privacy demonstrated because "his purpose in taking the box to [a hiding place] shortly after the search warrant was executed at his office was to hide it and its incriminating contents). The record is silent on whether he had a subjective expectation that the bag was to remain free from governmental intrusion, and like the defendant in Carlisle, he did not know what was in the bag, which he had not seen before that day.

In United States v. Allen, 741 F.Supp.15 (D. Me. 1990), law enforcement authorities seized in the United States mails a package addressed to "Kurt Humphrey" and searched it, finding LSD. Humphrey was not the intended recipient; he had agreed, in exchange for $50, to let his name and address be used as addressee for packages belonging to the defendant, and to deliver these packages upon receipt, to the defendant. The government argued that because the defendant was neither the sender nor the addressee of the envelope and its contents, he had no Fourth Amendment interest to assert. Id. at 15-16. The Court rejected the argument, applying the factors that the Supreme Court identified in Rawlings, 448 U.S. at 105, and those the First Circuit relied on in

---

[15] Despite this testimony, Sierra-Ayala did not say he could prevent people from looking inside the bag or that he considered the bag private. The Magistrate Judge observed that Sierra-Ayala did not show that he could exclude others from the bag, and never testified or even alluded to the fact that he had a subjective expectation of privacy in the bag (R&R, Docket No. 83, p. 12).

Aguirre, 830 F.2d at 856.

As to the Rawlings factors, the Court observed that in contrast to the petitioner in Rawlings, Humphrey had been providing the mail service to the defendant for some months; the defendant had used the indirect mail arrangement on two previous occasions; there was no suggestion of any access to the envelope's contents by anyone other than the defendant; the use of a sealed envelope traveling in the United States mails would ordinarily be conserved a prudent way to maintain privacy inasmuch as federal law prevents tampering or unauthorized access to the mails; and there was no admission of lack of expectation that the envelope would remain free from governmental intrusion. See, Allen, 741 F.Supp. at 16-17 (applying Rawlings).

In connection with the Aguirre factors, the Court pointed out that the defendant asserted ownership of the envelope and its contents whereas no one else asserted any ownership or possessory interest in the envelope; on two previous occasions the same mail delivery procedure had been used and Humphrey delivered the material to the defendant; federal law precluded access by others while the item was in the United States mails, and there was no suggestion that Humphrey's access to the content was contemplated when the bailment relationship was established; the defendant had a subjective expectation of privacy, maintaining close check on the delivery, calling frequently to inquire as to the envelope's arrival; and the defendant's expectation of privacy was objectively reasonable because federal law protects objects in the United States mails from unauthorized access except in limited circumstances and the defendant had arranged a bailment with Humphrey pursuant to which Humphrey was to deliver the package to him upon receipt. Id. at 17-18 (applying Aguirre).

In contrast to Allen, the Rawlings and Aguirre factors weigh against Sierra-Ayala. The facts show no more than a tenuous arrangement with the cousin, without prior interactions between

them in connection with the bag at issue or any other bag. The mail delivery arrangement in Allen made the relationship more than transient, an element Sierra-Ayala cannot escape from, given the brief five-second period that he was in contact with the bag and the other circumstances of the case.

Relying on Perea, Sierra-Ayala argues that duration of a bailment is irrelevant to the standing analysis (Docket No. 104, pp. 8-9). In the context of Perea, where the bailee was in transit, duration may be irrelevant. But the Supreme Court has considered the duration of a defendant's contact with the property as a factor in determining whether the defendant has shown a legitimate expectation of privacy entitling him to invoke the exclusionary rule. In Rakas v. Illinois, 439 U.S. 128 (1978), it observed that a casual visitor who walks into a house one minute before a search of the house commences and leaves one minute after the search ends would have no legitimate expectation of privacy in the house. Id. at 142. In Minnesota v. Carter, 525 U.S. 83 (1998), it held that defendants, who were in another person's apartment for a short period of time solely for the purpose of packaging cocaine, had no legitimate expectation of privacy in the premises, distinguishing between the legitimate privacy expectations of overnight guests and the mere permission to be on the premises given to those without previous connections with the householder who enter the premises to conduct a business transaction for a relatively short period of time. Id.

In this light, casual, transient visitors, or what comes down to the same thing, those with a casual, transient contact with property and owners or householders do not have standing to challenge the search of those premises. See, United States v. Torres, 162 F.3d 6, 10 (1st Cir. 1998)(casual visitor in apartment lacks reasonable expectation of privacy in the premises); United States v. Flores, 172 F.3d 695, 699 (9th Cir. 1999)(defendant who was in apartment to conduct a

brief drug transaction has no standing to object to the admission of evidence seized from the apartment). And the principle is not exclusive of real estate, having been applied in other Fourth Amendment settings.

For example, in United States v. Sánchez, 943 F.2d 110 (1st Cir. 1991), the First Circuit concluded that a defendant lacked sufficient expectation of privacy in a vehicle he was driving, pointing out, among other things, that defendant had only a casual possession of the car and there was no evidence that he had used the car on other occasions. Id. at 113-114. In the Court's view, a pattern of permission, together with defendant's sole control on a long trip, would have minimized the informal and "temporary" nature of the way defendant had acquired possession of the car. Id. at 114.[16] Likewise, in Lochan, 674 F.2d at 965, the First Circuit observed that the fact defendant was driving a vehicle in a long trip engendered a greater privacy expectation than would a short trip. And as noted above, in Rawlings the Supreme Court took into account what it described as the "sudden" bailment and "precipitous" nature of the transaction.

These adjectives –temporary, sudden, precipitous– all apply to the brief, five-second contact that Sierra-Ayala had with the bag with the cousin standing nearby. Contrary to the cases Sierra-Ayala relies on for support, Benítez-Arlequín and Perea, he stood in the same spot where his cousin gave him the bag and did not move or attempt to move the bag to any other location. Compare this situation with that of the defendant in Reeves, 798 F.Supp. at 1461-1463, 1465-1466, who was accorded standing to challenge the search of his cousin's locked briefcase, stored in the hatchback portion of defendant's vehicle while the defendant drove the vehicle from Medical Lake to Spokane, Washington.

---

[16] Defendant had been given the car by the owner's girlfriend. 943 F.2d at 113.

### III. CONCLUSION

Taking into account the totality of circumstances, Sierra-Ayala did not have a legitimate expectation of privacy in the bag. He was not the bag's owner and had no belongings inside the bag. He was in legitimate possession of it. The possession, however, was brief, lasting five seconds, during which Sierra-Ayala's cousin –the apparent owner of the bag– stood next to him. The relationship between Sierra-Ayala and his cousin was not close. Additionally, there was no evidence that: (1) the cousin gave Sierra-Ayala permission to use or take the bag anywhere; (2) in the past, Sierra-Ayala had taken care of the bag at issue or any other bag for the cousin; or (3) Sierra-Ayala took precautions to safeguard any privacy interest he may have had in the bag, seeking to preserve it as private.

What is more, the record is silent on whether Sierra-Ayala had any expectation that the bag would remain free from governmental intrusion. He said he did not know what was inside the bag. Assuming he demonstrated a subjective expectation of privacy in the bag, a legitimate expectation of privacy means more than a bare subjective expectation. Given this set of facts, Sierra-Ayala cannot challenge the search and seizure of the bag under the Fourth Amendment. Therefore, the motion to suppress at Docket No. 38 is DENIED.

**SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of August, 2019.

s/Pedro A. Delgado Hernández
PEDRO A. DELGADO HERNÁNDEZ
United States District Judge